Slip Op. 20-40

# UNITED STATES COURT OF INTERNATIONAL TRADE

**THE HOME DEPOT U.S.A., INC.,**

Plaintiff,

v.

**UNITED STATES,**

Defendant.

**Before: Timothy M. Reif, Judge**

**Court No. 14-00061**

**PUBLIC VERSION**

## OPINION

Granting Plaintiff's Rule 56 cross-motion for summary judgment and denying

Defendant's Rule 56 cross-motion for summary judgment.

Dated: ___March 26, 2020_____

<u>Wm. Randolph Rucker</u>, Drinker Biddle & Reath LLP for Plaintiff The Home Depot U.S.A., Inc.

<u>Edward F. Kenny</u>, Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, <u>Aimee Lee</u>, Assistant Director, and <u>Justin R. Miller</u>, Attorney-in-Charge, International Trade Field Office.  With them on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General and <u>Jeanne Davidson</u>, Director, Commercial Litigation Branch and Offices of Foreign Litigation and International Legal Assistance.

This case is before this court pursuant to a remand ordered by the U.S. Court of

Appeals for the Federal Circuit ("CAFC") to determine the proper classification of the

imported merchandise.  *Home Depot U.S.A., Inc. v. United States*, 915 F.3d 1374 (Fed. Cir. 2019).  The dispute concerns the tariff classification of door entry devices imported by Plaintiff Home Depot U.S.A., Inc. ("Plaintiff").  Plaintiff challenges the classification by United States Customs and Border Protection ("Defendant" or "Customs") of the subject merchandise under subheading 8301.40.60 of the Harmonized Tariff Schedule of the United States ("HTSUS"), which covers door locks, specifically key-operated locks, and carries a 5.7 percent *ad valorem* duty.  Plaintiff argues that the subject merchandise is properly classified under subheading 8302.41.60 of the HTSUS, which covers door mountings, including door knobs, and carries a 3.9 percent *ad valorem* duty.  The question presented is whether the subject merchandise is properly classified in Heading 8301 of the HTSUS as locks or in Heading 8302 as knobs.

The parties filed cross-motions for summary judgment addressing the proper classification of the imported merchandise.  *See* Pl.'s Mem. of Law in Supp. Of Pl.'s Mot. for Summ. J., ECF No. 79 ("Pl. Br."); Mem. in Opp. to Pl.'s Mot. For Summ. J. and in Supp. of Def. Cross-Mot. for Summ. J., ECF No. 84 ("Def. Br.").  This court has jurisdiction over this action under 28 U.S.C. § 1581(a).

For the reasons set forth below, the court determines that the subject merchandise is properly classified in Heading 8302.

## BACKGROUND

Lewis Carroll's *Alice's Adventures in Wonderland and Through the Looking Glass* opens with Alice falling "down, down, down" a rabbit hole in pursuit of a White Rabbit.[1] Once she lands, "she [finds] herself in a long, low hall…. There were doors all around the hall, but they were all locked."[2]

In Walt Disney's 1951 movie adaptation, *Alice in Wonderland*, Alice enacts the scene through a conversation with a doorknob:

Doorknob: "Ohhhhh!!"

Alice: "OH!  Oh, I beg your pardon."

Doorknob: "Oh, oh, it's quite all right.  But you did give me quite a turn!"

Alice: "You see, I was following…"

Doorknob: "Rather good, what?  Doorknob, turn?"

Alice: "Please, sir."

Doorknob: "Well, one good turn deserves another!  What can I do for you?"

Alice: "Well, I'm looking for a white rabbit.  So, um, if you don't mind…"

Doorknob: "Uh?  Oh!"

Alice: "There he is! I simply must get through!"

Doorknob: "Sorry, you're much too big.  Simply impassible."

Alice: "You mean impossible?"

---

[1] Charles Ludwidge Dodgson (aka Lewis Carroll), *Alice's Adventures in Wonderland and Through the Looking Glass*, Barnes and Noble Classics (New York 2004).  *Alice's Adventures in Wonderful* was first published in 1865, in Oxford by Clarendon Press with illustrations by John Tenniel.  *Through the Looking-Glass and What Alice Found There* was first published in 1871.
[2] *Id.*

Doorknob: "No, impassible.  Nothing's impossible!"[3]

## I. Material Facts Not in Dispute

USCIT Rule 56(a) requires that the court grant summary judgment if a moving

party can show that "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Movants should present material facts as

short and concise statements, in numbered paragraphs and cite to "particular parts of

materials in the record" as support.  USCIT Rule 56(C)(1)(A).  The opponent must, in

response, "include correspondingly numbered paragraphs responding to the numbered

paragraphs in the statement of the movant."  USCIT Rule 56.3(b).

The Parties submitted separate statements of facts simultaneously with their

respective summary judgment motions.  *See generally* Pl.'s Statement of Material Facts

Not in Issue ("Pl. Stmt. Facts"), ECF No. 79; Def.'s Statement of Undisputed Material

Facts ("Def. Stmt. Facts"), ECF No. 84-3.  The responses to these statements contained

mixtures of disputed and undisputed terms, phrases, or sentences within a numbered

paragraph.  *See generally* Def.'s Resp. to Pl. Stmt. Facts, ECF No. 84-2; Pl.'s Resp. to

Def. Stmt. Facts, ECF No. 89-1.  The court reviewed each Party's separate submissions

of facts to determine the undisputed facts.  Upon review of Parties' respective

statements of facts and supporting documents, the court finds the following undisputed

and material facts regarding the subject merchandise.[4]

---

[3] *Walt Disney's Alice In Wonderland, The All-Cartoon Wonderfilm* (1951), based on *Alice's Adventures in Wonderland and Through the Looking Glass*, by Lewis Carroll (1865, 1871).

[4] For purposes of this discussion, citations are provided to the relevant paragraph number of the undisputed facts and response, and internal citations generally have been omitted.

### a.  The Imported Merchandise

During the period July 2012 through December 2012, Plaintiff imported the

subject merchandise into the United States through five different ports of entry.  Pl.

Stmt. Facts ¶ 2; Def.'s Resp. to Pl. Stmt. Facts ¶ 2.  The subject articles are keyed entry

devices used typically on exterior doors of residential structures but that are also used

on interior doors such as basements or important storage spaces.  Def. Exhibit ("Ex.") 1,

Glass Deposition ("Dep.") at 49.[5]  The subject merchandise is comprised of: (1) an

exterior knob assembly; (2) an interior knob assembly; (3) a latch assembly; (4) a

flanged strike plate; (5) a key cylinder; (6) two keys on a ring; and, (7) mounting

hardware.  *See* Pl. Stmt. Facts ¶ 27; Def.'s Resp. to Pl. Stmt. Facts ¶ 27.  There are no

material facts at issue regarding the nature of the subject merchandise.  Pl. Br. at 9;

Def. Br. at 15.  *See also* Def.'s Resp. to Pl. Stmt. Facts. ¶ 27.

The keyed entry devices are available in four different finishes:  stainless steel

(SKU 154644); polished brass (SKU 154709); antique brass (SKU 154733); and, satin

nickel (SKU 881996).  Pl. Stmt. Facts ¶ 3; Def.'s Resp. to Pl. Stmt. Facts ¶ 3.  These

decorative variations have identical components, operate in the same manner, have

equivalent functions, and are made by the same manufacturer.  Def. Stmt. Facts ¶ 6;

Pl.'s Resp. to Def. Stmt. Facts. ¶ 6.

The exterior and interior knob assemblies of the subject merchandise include the

door knobs and escutcheons (protective and decorative trims around the door handles).

---

[5] The parties dispute the "characterization" of Glass's testimony regarding the uses to which the subject merchandise can be put.  Pl.'s Resp. to Def. Stmt. Facts ¶ 35 (arguing that the subject merchandise is sold for exterior and interior use, rather than "predominantly exterior use" as described by Defendant). The court, upon reviewing the supporting documents, has determined that the characterizations are largely similar, and that this dispute is not material.  Plaintiff also asserts that this dispute is not material. Pl.'s Resp. to Def. Stmt. Facts ¶ 35.

Pl. Br. at 15; Def. Br. at 8.   These knob assemblies provide the grasping ability for

opening and closing the door.  Pl. Stmt. Facts ¶ 29; Def.'s Resp. to Pl. Stmt Facts ¶ 29.

The exterior knob assembly provides a keyhole into which an individual can insert a key

to lock and unlock the door.  The interior knob incorporates a thumb turn to lock and

unlock the door from the inside.  Def. Stmt. Facts ¶ 19; Pl.'s Resp. to Def. Stmt. Facts ¶

19.  The key cylinder contains a keyway and a tumbler mechanism.  The exterior knob

incorporates the key cylinder into its assembly.  The keys fit into the cylinder.  Pl. Ex. 1,

Pl. First Resp. to Def.'s Interrog. ¶ 7.  The flanged strike plate is a metal plate attached

to the door frame with two screws.  Pl. Br. at 16; Def. Br. at 9.  The latch assembly

contains a beveled latch bolt that projects out of the side of the door into the strike plate

when the door is closed.  Pl. Stmt. Facts ¶ 30 (citing Pl. Ex. 1, Pl. First Interrog. Resp. ¶

7); Def.'s Resp. to Pl. Stmt. Facts ¶ 30.  The flat end of the beveled latch bolt also

contains a deadlocking latch bolt that does not project into the strike plate when the

door is closed.  Def. Stmt. Facts ¶ 14; Pl.'s Resp. to Def. Stmt. Facts ¶ 14.  The use of

the knobs while unlocked retracts the latch bolt.  Def. Stmt. Facts ¶ 15; Pl.'s Resp. to

Def. Stmt. Facts ¶ 15.

Plaintiff is a home improvement retailer that sells a variety of door hardware,

including deadbolts, the subject merchandise and three related door devices:  viz.,

"privacy," "passage," and "dummy" devices.  Pl. Stmt. Facts ¶¶ 9, 18; Def.'s Resp. to Pl.

Stmt. Facts ¶¶ 9, 18.  Only the keyed entry device[6] is at issue in this case.

---

[6] The parties dispute whether to refer to the imported merchandise as an "entry door knob" or a "keyed entry device."  Def. Resp. to Pl. Stmt. Facts ¶ 3.  The parties similarly dispute the proper naming conventions of the related door devices of the subject merchandise.  Def. Resp. to Pl. Stmt. Facts ¶ 18.  A disagreement as to the name of the imported merchandise does not create an issue of material fact, and the court proceeds by referring to the subject merchandise as a "keyed entry device."  The other door devices, in similar fashion, will be referred to as dummy devices, passage devices, and privacy devices.

### b.  Other Similar Devices Sold by Plaintiff

The characteristics of the related door devices, although not at issue in this case, provide helpful comparisons to keyed entry devices.[7]  Each of the related door devices contains exterior and interior knob assemblies.  Pl. Stmt. Facts ¶ 18; Def.'s Resp. to Pl. Stmt. Facts ¶ 18.  A privacy device has a latching mechanism along with a lock mechanism on the interior side.  Pl. Stmt. Facts ¶ 18; Def.'s Resp. to Pl. Stmt. Facts ¶ 18; Pl. Ex. 10, Mounted Door Hardware Ex.  The interior lock mechanism is typically in the form of a thumb turn where an individual can manually lock and unlock the door by hand.  Pl. Ex. 10, Mounted Door Hardware Ex; Transcript of Oral Argument at 20.  The exterior knob of a privacy device contains an emergency release that can override the interior lock with a coin or other similarly shaped device.  *Id*.  Bathroom and bedroom doors typically use a privacy device.  Pl. Stmt. Facts ¶ 18; Def.'s Resp. to Pl. Stmt. Facts ¶ 18.  A passage device has a latching mechanism, but no locking mechanism. Pl. Stmt. Facts ¶ 18; Def.'s Resp. to Pl. Stmt. Facts ¶ 18.  This device may be used for closet, hall, bedroom or basement doors.  Pl. Stmt. Facts ¶ 18; Def.'s Resp. to Pl. Stmt. Facts ¶ 18.  A dummy device has knob components but no latching or locking mechanism.  Closet doors typically incorporate a dummy device.  Pl. Stmt. Facts ¶ 18; Def.'s Resp. to Pl. Stmt. Facts ¶ 18.

In Home Depot's internal database, keyed entry, privacy, passage and dummy devices are categorized in the same group.  Pl. Stmt. Facts ¶ 19; Def.'s Resp. to Pl.

---

[7] This court has previously compared the subject merchandise to other products not in dispute in a customs classification case.  *See, e.g., Link Snack, Inc. v. United States*, 37 CIT ___, ___, 901 F.Supp.2d 1369, 1374 (2013), *aff'd* 742 F.3d 962 (Fed. Cir. 2014) (comparing the subject merchandise of cured beef jerky to other meats such as ham, bacon and hot dogs); *Infantino, LLC v. United States,* Slip Op. 14-155, 2014 Ct. Intl. Trade LEXIS 164 (CIT December 24, 2014) (comparing the subject merchandise play mat to other toys).

Stmt. Facts ¶ 19.  Privacy and passage devices are classified in Heading 8302.  *See* Pl.

Br. at 13; Def. Br. at 31.  Because dummy devices have no latching mechanism, the

court will not include them in the comparative analysis.

The court also compares keyed entry devices to deadbolts.  The primary function

of a deadbolt is to lock and secure a door; however, a deadbolt does not have a handle

or knob with which to open and close a door from the outside.  Pl. Ex. 10, Mounted Door

Hardware Ex.; Pl. Ex. 5, Colvin Exp. Rep. at 3, 9.  Defendant asserts that the primary

function of the subject merchandise is also to lock and secure a door.  Def. Br. at 13,

16-17, 19, 21, 30.  Deadbolt locks are classified in Heading 8301, because Heading

8302 excludes key-operated bolts.  *See* HTSUS 8302, Explanatory Note (D)(2).

## STANDARD OF REVIEW

Customs' protest decisions are reviewed *de novo* by the court.  28 U.S.C. §

2640(a)(1).  USCIT Rule 56 permits summary judgment when "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  USCIT R. 56(a).  "[A]ll evidence must be viewed in the light most favorable to the

nonmoving party, and all reasonable factual inferences should be drawn in favor of the

nonmoving party."  *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed.

Cir. 1994) (citations omitted).  To raise a genuine issue of material fact, a party cannot

rest upon mere allegations or denials and must point to sufficient supporting evidence

for the claimed factual dispute to require resolution of the differing version of the truth at

trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "A genuine

factual dispute is one potentially affecting the outcome under the governing law." *Id.* at

248.

Where, as here, cross-motions for summary judgment are before the court, "each

party carries the burden on its own motion to show entitlement to judgment as a matter

of law after demonstrating the absence of any genuine disputes over material

facts." *Am. Fiber & Finishing, Inc. v. United States*,  39 CIT ___, ___, 121 F. Supp. 3d

1273, 1279 (2015) (quoting *Massey v. Del Labs.*, 118 F.3d 1568, 1573 (Fed. Cir.

1997)).

Summary judgment in a classification case is appropriate "when there is no

genuine dispute as to the underlying factual issue of exactly what the merchandise

is." *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir.

1998) (citing *Nissho Iwai Am. Corp. v. United States*, 143 F.3d 1470, 1472-73 (Fed. Cir.

1998)).   The court reviews classification cases on "the basis of the record made before

the court."  28 U.S.C. § 2640(a).  The court has "an independent responsibility to decide

the legal issue of the proper meaning and scope of HTSUS terms."  *Warner-Lambert*

*Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citing *Rocknel Fastener,*

*Inc. v. United States*, 267 F.3d 1354, 1358 (Fed. Cir. 2001)).  Customs is afforded a

statutory presumption of correctness in classifying merchandise under the HTSUS.  *See*

28 U.S.C. § 2639(a)(1).  Plaintiff bears the burden to show that the government's

classification is incorrect.  *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed.

Cir. 1984).  If that burden is met, the court then has the responsibility to determine the

correct classification.  *Id.*

"The ultimate question in a classification case is whether the merchandise is properly classified under one or another classification heading," which is "a question of law." *Bausch & Lomb v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998).  The determination of whether an imported item has been properly classified involves a two-step analysis.  *Sports Graphics, Inc. v. United States*, 24 F.3d 1390, 1391 (Fed. Cir. 1994); *see also Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006).  First, the court must construe the proper meaning of specific terms of the tariff provision. *See Universal Elecs. Inc. v. United States*, 112 F.3d 488, 491 (Fed. Cir. 1997).  Second, the court must determine whether the merchandise at issue comes within the description of such terms as properly construed.  *Id.*  The first step is a question of law, while the second is one of fact.  *Pillowtex Corp. v. United States*, 171 F.3d 1370, 1373 (Fed. Cir. 1999).  When the parties do not dispute any facts regarding the merchandise, then resolution of the classification depends solely on the first step.  *Cummins Inc.*, 454 F.3d at 1363.

Every new entry of goods into the United States constitutes a new cause of action because every classification involves both the interpretation of the relevant statute as well as questions of fact regarding the merchandise.  *Stare decisis* binds the court to prior legal determinations and bars the relitigation of issues decided in those actions.  *United States v. Mercantil Distribuidora, S.A.*, 45 CCPA 20, 23-24 (1957). However, "circumstances justify limiting the finality of the conclusion in customs controversies to the *identical* importation."  *United States v. Stone & Downer Co.*, 274 U.S. 225, 236 (1927) (emphasis supplied).  Since *stare decisis* "deals only with law," *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1570 (Fed. Cir. 1993), judicial precedent

holds weight only with respect to the legal construction of specific terms or provisions,

not questions of fact.  *Id.*


## PROCEDURAL HISTORY AND LEGAL FRAMEWORK

Customs classified the products under HTSUS subheading 8301.40.6030.

Subheading 8301.40.6030 provides as follows:

| 8301 | Padlocks and locks (key, combination or electrically operated), of base metal; clasps and frames with clasps, incorporating locks, of base metal; keys and parts of any of the foregoing articles, of base metal: |
|------|------|

| 8301.40 | Other locks: |
|---------|--------------|

| 8301.40.60 | Other: |
|------------|--------|

| 8301.40.6030 | | Door locks, locksets and other locks suitable for use with interior or exterior doors (except garage, overhead or sliding doors). |
|--------------|--|------|

Plaintiff asserts that the products should have been classified under HTSUS

subheading 8302.41.6045.  Subheading 8302.41.6045 provides as follows:

| 8302 | Base metal mountings, fittings and similar articles suitable for furniture, doors, staircases, windows, blinds, coachwork, saddlery, trunks, chests, caskets or the like; base metal hat racks, hat-pegs, brackets and similar fixtures; castors with mountings of base metal; automatic door closers of base metal; and base metal parts thereof: |
|------|------|

Other mountings, fittings and similar articles, and parts thereof:

| 8302.41 | Suitable for buildings: |
|---------|-------------------------|

Other:

| 8302.41.60 | Of iron or steel, of aluminum or of zinc: |
|------------|-------------------------------------------|

| 8302.41.6045 | Other |
|--------------|-------|

Customs denied the protests, leading Plaintiff to file an action in this court.  *See*
Complaint, *Home Depot U.S.A., Inc. v. United States,* 41 CIT ___, 269 F. Supp. 3d
1306 (2017).  On cross-motions for summary judgment, this court held for Defendant
and denied Plaintiff's motion for summary judgment.  *Home Depot U.S.A., Inc. v. United
States*, 41 CIT ___, 269 F. Supp. 3d 1306 (2017).  This court concluded that the subject
merchandise was described "in whole" by Heading 8301, and not by Heading 8302.  *Id.*

On appeal, the CAFC determined that the subject merchandise is a composite
good consisting of a "[keyed] lock component," which "functions to lock and unlock [a]
door," and a "doorknob component," which "functions to allow [a] door to be grasped,
opened, closed and latched."  *Home Depot U.S.A., Inc. v. United States*, 915 F.3d at
1380.  Regarding each heading as equally specific, the CAFC found that "[H]eading
8301 refers to the lock component" while "[H]eading 8302 refers to the door knob
component."  *Id*.  The CAFC further concluded that subsection 3(b) of the General
Rules of Interpretation ("GRI") of the HTSUS governs the classification of the subject
merchandise and remanded the case to this court to determine the proper classification
of the subject merchandise.  *Id.*

HTSUS GRI 3(b) provides, in pertinent part, that "…composite goods …made up
of different components… shall be classified as if they consisted of the material or
component which gives them their *essential character*."  HTSUS, GRI 3(b) (emphasis
supplied).  Accordingly, to apply GRI 3(b) in this case, the court is required to determine
which component — the lock or the knob — gives the subject merchandise its "essential
character" and, based on that decision, whether the product is appropriately classified in
Heading 8301 or Heading 8302.  *Home Depot,* 915 F.3d at 1380-81.

The essential character of an article is "the component which is indispensable to the structure, core, or condition of the article, *i.e.,* the attribute which strongly marks or serves to distinguish what it is." *Home Depot USA, Inc. v. United States*, 30 CIT 445, 460, 427 F. Supp. 2d 1278, 1293 (2006), *aff'd*, 491 F.2d 1334 (Fed. Cir. 2007) (citing *A.N. Deringer, Inc. v. U.S.*, 66 Cust. Ct. 378, 383 (Cust. Ct. 1971)).  The CAFC further established that the essential character inquiry is factual in nature.  *Pillowtex Corp. v. United States*, 171 F.3d 1370, 1376 (Fed. Cir. 1999).

The court may also consult the Explanatory Notes ("ENs") to the Harmonized Commodity Description and Coding System, developed by the World Customs Organization, for additional direction on the scope and meaning of tariff headings and chapter and section notes, including the "essential character" of a product.  Explanatory Notes are "generally indicative of the proper interpretation of a tariff provision."  *Agfa Corp. v. United States*, 520 F.3d 1326, 1239 (Fed. Cir. 2008) (citation omitted).  "Unlike Chapter Notes, Explanatory Notes are not legally binding."  *Deckers Outdoor Corp. v. United States*, 714 F.3d 1363, 1367 n. 1 (Fed. Cir. 2013).  However, "the Explanatory Notes are persuasive authority for the court when they specifically include or exclude an item from a tariff heading."  *H.I.M./Fathom Inc. v. United States*, 21 CIT 776, 779, 981 F. Supp. 610, 613 (1997); *see also BASF Corp. v. United States*, 30 CIT 227, 232 F. Supp. 2d 1200, 1205 n.6 (2006), *aff'd*, 497 F.3d 1309 (Fed. Cir. 2007).

In a GRI 3(b) analysis, "[t]he factor which determines essential character will vary as between different kinds of goods."  HTSUS, GRI 3(b), EN Rule 3 at (VIII).  The list of possible factors set forth in the ENs that could determine essential character is not exhaustive, and no factor is necessarily conclusive.  *Structural Indus. v. United States*,

29 CIT 180, 185, 360 F. Supp. 2d 1330, 1336 (2005); *Home Depot*, 30 CIT at 459, 427

F. Supp. 2d at 1293 (2006).

Factors listed by the ENs that the CAFC and this court have examined are "the

nature of the material or component, its bulk, quantity, weight or value, or by the role

of a constituent material in relation to the use of the goods." HTSUS, GRI 3(b), EN Rule

3 at (VIII). *See, e.g., Home Depot U.S.A. Inc. v. United States,* 491 F.3d 1334, 1336

(Fed. Cir. 2007); *Swimways Corp. v. United States*, 42 CIT ___, ___, 329 F. Supp. 3d

1313, 1322 (2018). The court may also consider the article's "name… other recognized

names… invoice and catalogue descriptions… size, primary function, uses… ordinary

common sense," *Home Depot* at 459-460 (citing *United China & Glass Co. v. U.S.*, 61

Cust. Ct. 386, 389 (1968)), *aff'd*, 491 F.3d 1334 (Fed. Cir. 2007), "the respective

indispensability of the properties of the components of the merchandise, the respective

cost of the components of the merchandise, the basis for a consumer's decision to

purchase the merchandise, the respective duration and/or frequency of the use of the

components, and the manner in which the merchandise is invoiced." *Toy Biz, Inc. v.

United States,* 26 CIT 816, 828 n.15, 219 F. Supp. 2d 1289, 1301 n.15 (2002) (citing

*Better Home Plastics Corp. v. United States,* 20 CIT 221, 224-25, 916 F. Supp. 1265,

1267-68 (1996), *aff'd,* 119 F.3d 969 (Fed.Cir. 1997)). One component can impart the

article's essential character even if two components are both indispensable to the use of

the article. *Alcan Food Packaging (Shelbyville) v. U.S.*, 771 F.3d 1364, 1367 (Fed. Cir.

2016).

Goods must be "classified in the form in which they are imported." *The Pomeroy

Collection, Ltd., v. United States*, 336 F.3d 1370, 1372 (Fed. Cir. 2003) (internal

citations omitted).  In further clarifying *Pomeroy,* the CAFC stated that "[a]lthough the

'essential character' inquiry focuses on an individual component of the goods, the goods

are not classified as though they were composed exclusively of that

component."  *Structural Industries v. United States,* 356 F.3d 1330, 1369 (Fed. Cir.

2005).

In sum, it is the responsibility of this court to consider the totality of the evidence

put before it in conducting an "essential character" analysis under GRI 3(b).  *Structural*

*Indus.,* 29 CIT at 185.  The CAFC has found "no error" in a GRI 3(b) analysis when this

court has "carefully considered all of the facts" and conducted a "reasoned balancing of

all the facts" to determine essential character.  *Better Home Plastics Corp. v. United*

*States*, 119 F.3d 969, 971 (Fed. Cir. 1997).


## DISCUSSION

Based on the record before the court, the court focuses on four factors to assess

the essential character of the subject merchandise and determine its appropriate

classification: (1) commercial standards; (2) marketing materials; (3) quantitative data;

and, (4) the primary function of the subject merchandise.

In brief, and as discussed below, the court determines that neither of the first two

factors – commercial standards or marketing materials – weighs in favor of classifying

the subject merchandise under one tariff provision or the other.  The third – quantitative

data – provides limited support for the conclusion that the knob component, rather than

the lock component, imparts the essential character to the subject merchandise.  The

court further determines that the primary function of a keyed entry device is to grasp,

open and close the door, a function provided by the knob component.  On this basis, the

court concludes that the essential character of the subject merchandise is its knob

component and should be classified under Heading 8302.

## I. Commercial Standards

The court's examination of commercial standards is comprised of an evaluation

of the (1) product descriptions in standards set out by the American National Standards

Institute ("ANSI") and (2) relevance of the dead-locking latch bolt, latch assembly and

U.S. Patent No. 6,186,562 ("562 Patent"), which covers the latch assembly of the

subject merchandise.  Both parties acknowledge that both the ANSI Standards and the

562 Patent apply to the subject merchandise.  *See* Def. Stmt. Facts. ¶ 8; Pl.'s Resp. to

Def. Stmt. Facts. ¶ 8; Def. Ex. 7, "Patents specific to Entry Locks at issue"; Pl. Resp. Br.

at 10-11.  Defendant asserts that the ANSI standards demonstrate that the subject

merchandise is a "lock" classifiable in Heading 8301, and that the deadlocking latch bolt

in the subject merchandise along with the 562 Patent support this conclusion.  Def. Br.

at 19-20, 24.  Plaintiff asserts that Defendant misinterprets the information found in the

ANSI standards, and that the patent does not provide additional support.  Pl. Resp. Br.

at 10-12, 16.

The court concludes that neither the dead-locking latch bolt, latch assembly and

562 Patent, nor the ANSI standards weigh in favor of classifying the subject

merchandise under one tariff provision or the other.

### a.  Product Descriptions Contained in ANSI Standards

ANSI and the Builders Hardware Manufacturers Association ("BHMA") maintain criteria by which all door hardware is evaluated.[8]  The ANSI/BHMA standards contain descriptions of various door devices, including the subject merchandise, at ANSI/BHMA standard A156.2-2011.[9]  *See* Pl. Ex. 17, ANSI/BHMA A156.2-2011 at 9-12.  Both the CAFC and this court have previously relied on ANSI standards when interpreting HTSUS terms.  *See, e.g., Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1361 (Fed. Cir. 2001) ("Standards promulgated by industry groups such as ANSI . . . are often used to define tariff terms . . . ").  *See also THK America, Inc. v. United States*, 17 CIT 1169, 1173, 837 F. Supp. 427, 432 (1993) ("This Court finds that the most authoritative set of definitions in regard to the terms involved in this case are contained in the [trade association] … and accepted by [ANSI]").

ANSI has evaluated, rated and certified the subject merchandise in each of its varying finishes.[10]  Pl. Ex. 1, Pl.'s First Interrog. Resp. ¶ 6 (a)-(c).  ANSI determined that each meets the "Function Description" of an "Entry Lock" as described in the

---

[8] ANSI is a standards organization and the BHMA is a trade association. Together, the organizations publish standards, conduct tests and certify certain hardware-related products.

[9] The nomenclature "ANSI/BHMA A156.2-2011" denotes the series and publication year of the ANSI/BHMA Standards.  The "A156" term denotes the series that provides standards for an array of builder hardware products.  ANSI/BHMA Standards, Builders Hardware Manufacturers Association (2020) available at *https://buildershardware.com/ANSI-BHMA-Standards* (last visited Mar. 12, 2020).  The "A156.2" term denotes a set of standards specifically for "Bored & Preassembled Locks and Latches," including the subject merchandise.  Pl. Ex. 17, ANSI/BHMA A156.2-2011.  The "2011" term denotes the year that the standard was promulgated.  In this case, the court reviews the 2011 publication of the A156.2 standard because it was the most recent at the time Plaintiff imported the subject merchandise.

[10] ANSI evaluates and provides different "Grade Qualifications" for products in the A156.2-2011 standards.  A Grade 3 qualification meets the lowest criteria, a Grade 2 qualification meets higher criteria, and a Grade 1 qualification meets the highest criteria.  The criteria set by ANSI include strength, cycles, security, quality of metal finish, etc.  Pl. Ex. 17, ANSI/BHMA A156.2-2011.

ANSI/BHMA A156.2-2011 standards.  Def. Stmt. Facts ¶ 20; Pl.'s Resp. to Def. Stmt.

Facts ¶ 20.  The ANSI/BHMA "Function Description" of an "Entry Lock" is as follows:

> **F82B Grades 2 and 3.  Entry Lock.**  Dead locking latch bolt operated by
> lever from either side except when outside lever is locked by locking device
> on inside.  When outside lever is locked, operating key in outside lever
> unlocks locking device.  Locking device shall automatically release when
> inside lever is operated or be in the unlocked position before inside lever is
> operated.[11]

Pl. Ex. 17, ANSI/BHMA A156.2-2011 at 10, F82B.

Defendant asserts that the categorization of the subject merchandise as an

"Entry Lock" by ANSI supports a finding that the essential character of the subject

merchandise is a "lock."  Def. Br. at 19-20.  In fact, throughout its submissions,

Defendant places heavy emphasis on the characterization of the subject merchandise

as a "lock" as the reason that the subject merchandise should be classified under

Heading 8301.  Plaintiff asserts that Defendant misinterprets the information in ANSI,

and that the Function Descriptions should not be regarded as definitions.  Pl. Resp. Br.

at 16-17.

The court concludes for two reasons that the use by ANSI of the term "lock"

within its descriptions does not support the conclusion that the lock feature of the

subject merchandise comprises its essential character.  First, ANSI also describes

various devices that are classified in Heading 8302 as "locks."  Pl. Ex. 14, ANSI/BHMA

A156.2-2011 at 9.  For example, ANSI refers to a privacy device as a "Privacy *Lock*" in

its description of that device.  ANSI/BHMA A156.2-2011 at 9, F76B (emphasis

---

[11] According to subsection 6.1 of the ANSI/BHMA A156.2-2011 standard, the bored lock descriptions of
Section 6 use the term "lever" for the sake of brevity.  These Section 6 descriptions apply equally to
models fitted with knobs instead of levers.  Pl. Ex. 14, ANSI/BHMA A156.2-2011 at 9.

supplied).[12]  It is uncontested that privacy devices are classified in Heading 8302.

Second, ANSI uses the term "lock" in ANSI's Function Descriptions of products that do

not contain a lock mechanism at all.  *See, e.g.,* ANSI/BHMA A156.2-2011 at 12 (F111…

Communicating Passage Lock).

### b.  Dead-locking latch bolt, Latch assembly and the 562 Patent

ANSI describes the latch assembly of a keyed entry device as a "dead locking

latch bolt."  Def. Stmt. Facts ¶ 13; Pl.'s Resp. to Def. Stmt. Facts ¶ 13.  A dead locking

latch bolt is "a type [of] latch bolt incorporating a plunger [on the flat end of the beveled

latch bolt] which, when depressed, automatically locks the projected latch bolt against

return by end pressure."  ANSI/BHMA A156.2-2011 at 5.

By contrast, ANSI describes the latch assembly of privacy (F76B) and passage

(F75) devices as simply a "latch bolt."  ANSI defines a "latch bolt" as

> a lock component having a beveled end which projects from the lock front
> in its extended position, but is [always] forced back into the lock case by
> end pressure or drawn back by action of the lock mechanism.  When the
> door is closed, the latch bolt projects into a hole provided in the strike,
> holding the door in a closed position.

*Id.*  The basic difference between a latch bolt and a dead locking latch bolt is that the

latter is a type of latch mechanism that prevents the beveled latch bolt from being

pushed back by a screwdriver, plastic card or other similar device.

---

[12] The ANSI Function Description of a "Privacy Lock" is as follows:
> **F76B Grades 2 and 3.  Privacy, Bedroom or Bath Lock.**  Latch bolt operated by lever
> from either side except when outside lever is locked by locking device inside.  Locking
> device shall automatically release when inside lever is operated or be in unlocked position
> before inside lever is operated.  Emergency release on outside shall permit outside lever
> to operate latch bolt.

Pl. Ex. 14, ANSI/BHMA A156.2-2011 at 9.

U.S. Patent No. 6,186,562 ("562 Patent") covers the latch assembly of the subject merchandise.  *See* Def. Ex. 7, "Patents specific to Entry Locks at issue." Notably, the 562 Patent also covers the latch assemblies of the respective privacy and passage devices, neither of which contains a dead locking latch bolt.  Pl. Ex. 11, Product Breakdown Matrix Provided by Fu Hsing Industrial.[13]  An essential character analysis may include information related to a patent.  *See, e.g., THK Am.,* 837 F. Supp. at 432 (stating that the description of a product in a patent can shed light on what the manufacturer believes the merchandise to be).

Defendant asserts that the dead locking latch bolt provides a "security feature only relevant with a keyed entry lock" and that the inclusion of the dead locking latch bolt in the subject merchandise supports a finding that the essential character of the subject merchandise is a "lock."  Def. Br. at 24.  Defendant specifically contrasts the inclusion of a dead locking latch bolt in a keyed entry device, based on ANSI's F82B description, with the lack of inclusion of a dead locking latch bolt in a privacy or passage device, based on ANSI's F76B and F75 descriptions, respectively.  Defendant's Response to Plaintiff's Statement of Undisputed Material Facts ("Def. Resp. Pl. Stmt.") ¶¶ 18, 22, 25, 27, 30-31.[14]  Defendant relies on the 562 Patent as support for its argument, asserting that the 562 Patent covers the dead locking latch bolt and that it provides a "security feature only relevant with a keyed entry lock."  Def. Br. at 24.

---

[13] Both Plaintiff and Defendant referred to Pl. Ex. 11, Product Breakdown Matrix Provided by Fu Hsing Industrial at Oral Argument.  Transcript of Oral Argument at 37-39.

[14] For example, Defendant states that it: "Avers that *entry locks are also distinguishable from privacy locks, passage latches, and dummy door knobs* on the basis that entry locks or lock sets utilize a keyed lock and deadlocking latchbolt and provide security."  Defendant makes similar statements in the other cited paragraphs.  Def. Resp. Pl. Stmt., ¶ 18 (emphasis supplied).

Plaintiff asserts that Defendant misconstrues the ANSI standards.  Pl.'s Resp. to Def.'s Cross-Mot. For Summ. J. ("Pl. Resp. Br.") at 16, 19, 20.  In particular, Plaintiff argues that ANSI Function Descriptions make clear that the deadlocking latch bolt (also called a "deadlatch") feature may occur on various types of passage and privacy devices.  Because these descriptions lack a keyed lock, Plaintiff maintains, they would not be classifiable in Heading 8301.  Pl. Resp. Br. at 19.  Plaintiff adds that "a door knob with a 'deadlocking latchbolt' may not even have a locking device." *Id* at 19.  Plaintiff concludes that "the inclusion of a deadlatch feature does not support classifying the subject entry door knobs in HTSUS Heading 8301." *Id.* (internal citations omitted).

The fact that the 562 Patent covers the latch assembly of the subject merchandise does not support a conclusion that the essential character of the subject merchandise is its lock feature.  That is because the 562 Patent covers latch assemblies, including those in the privacy and passage devices related to the subject merchandise, neither of which contains a dead locking latch bolt.  Pl. Ex. 11, Product Breakdown Matrix Provided by Fu Hsing Industrial.

The court determines that the inclusion of the dead locking latch bolt in the subject merchandise does not support the conclusion that the subject merchandise has the essential character of a "key-operated lock" within the meaning of Heading 8301, relative to "knobs for doors" within the meaning of the Explanatory Note to Heading 8302.  HTSUS 8302, EN (D)(7).  The court reaches this conclusion because a variety of devices with dead locking latch bolts do not contain a key cylinder or other locking feature identified by Heading 8301 (*e.g.*, an electronically operated lock).  *See* HTSUS Heading 8301.  For example, ANSI descriptions F77A and F77B cover "Patio and

Privacy Locks" and ANSI description F111 covers "Communicating Passage Locks," all of which include a "dead locking latch bolt" in their respective "Function Descriptions." ANSI/BHMA A156.2 at 9-10, 12.  Yet, as noted, none of these devices contains a key cylinder or other locking feature mentioned in Heading 8301.  Further, the 562 Patent, as noted by Plaintiff, covers both latch bolts in privacy and passage devices, as well as the deadlatch in a keyed entry device.

In addition, the court does not find persuasive Defendant's argument that the deadlatch provides a "security feature only relevant with a keyed entry lock."  Def. Br. at 24.  To start, as noted, there are products that afford the "security" of a deadlatch that do not have a keyed entry lock.  Further, the term "security" or "security feature" is not used in either heading at issue or in the respective Explanatory Notes.  Finally, it is notable that every device, including passage and privacy devices, provides some level of "security."  For example, a passage device latches a door such that it can be closed securely until a person turns the knob or depresses the lever to unlatch the door. Similarly, a privacy device excludes others from entering the room only until someone overrides the internal locking mechanism with a coin or screwdriver.  Accordingly, that the deadlatch provides some level of security is not persuasive for determining that the device should be classified in Heading 8301.

### c.  Conclusion — Commercial Standards

For the reasons set forth above, neither the product descriptions contained in the ANSI standards nor the presence or absence *per se* of a dead locking latch bolt weighs in favor of classifying the subject merchandise under one tariff provision or the other.

## II. Marketing Materials

### a. Six Elements of Marketing Materials

The court next considers how Plaintiff markets the subject merchandise to the public.  The marketing by an importer or retailer of the subject merchandise is relevant to an essential character analysis.  *The Pillsbury Co. v. United States,* 431 F.3d 1377, 1380 (Fed. Cir. 2005) (noting that dessert bars were marketed as "Fat Free Vanilla Frozen Yogurt Coated with Raspberry Sorbet" as support for the conclusion that yogurt provided the essential character); *Structural Indus. v. United States*, 29 CIT 180, 189, 360 F. Supp. 2d 1330, 1339 (2005) (citing *Mead Corp. v. United States*, 283 F.3d 1342, 1349 (Fed. Cir. 2002)); *THK Am., Inc. v. United States*, 17 CIT 1169, 1175, 837 F. Supp. 427, 433 (1993).  In particular, marketing can reveal how an importer or retailer regards the merchandise and which market(s) the importer or retailer is trying to reach. Both aspects are relevant considerations in an essential character analysis.  *THK Am.,* 17 CIT 1169, 1175, 837 F. Supp. 427, 433 (1993).

In broad terms, Defendant claims that Plaintiff markets the subject merchandise as "locks" classifiable in Heading 8301, rather than as "knobs" classifiable in Heading 8302.  Def. Br. at 17-19.  Plaintiff argues that "the subject products are specifically marketed as 'knobs'" and that any reference to the subject merchandise as "'locks' or 'locksets' does not direct classification to HTSUS Heading 8301."  Pl. Resp. Br. at 5.

The court examines six elements of marketing: (1) titles on product webpages; (2) descriptions in product webpages; (3) labels and phrases in physical product packaging; (4) installation instructions included in product packaging; (5) the retailer's Buying Guides; and, (6) retailer workshop written materials.  Neither party disputes the

content of the marketing materials that the court addresses in this section.  *See, e.g.*, Pl. Resp. Br. at 5-10; Def. Br. at 17-21.

For the reasons set forth below, the court concludes that marketing materials taken as a whole do not weigh in favor of classifying the subject merchandise under one tariff provision or the other.  In specific, the court determines that Plaintiff markets the subject merchandise in ways that, at times, highlight the keyed lock component, at other times, highlight the knob component, and, occasionally, highlight both aspects.

### b.  Website Titles of the Subject Merchandise

The first marketing element that the court examines is the way in which Plaintiff *titles* the subject merchandise on its website.  Plaintiff titles the subject articles as "Keyed Entry Knob[s]" or "Keyed Entry Knobset[s]" on its webpages.  *See* Pl. Ex. 2, Pl.'s First Interrog. Resp. ¶ 4(a)-(d) [hereinafter *Subject Articles Webpages*].[15]

Plaintiff's website titles of privacy and passage devices provide useful comparisons.[16]  The privacy devices are listed as "Privacy Knob" or "Privacy Knobset." *See* Pl. Ex. 7, Pl.'s First Interrog. Resp. ¶ 14 [hereinafter *Privacy Devices Webpages*]. The passage devices are listed as "Passage Knob" or "Passage Knobset."  *See* Pl. Ex. 8, Pl.'s First Interrog. Resp. ¶ 14 [hereinafter *Passage Devices Webpages*].

Plaintiff uses the term "Knob" or "Knobset" for all three devices, indicating a clear commonality among those devices on the basis that they include knobs to open and

---

[15] Plaintiff dedicates a separate webpage to each of the four different finishes of the subject merchandise.
[16] This court has previously compared the marketing of the subject merchandise to the marketing of other products.  *See, e.g.*, *Camelbak Prods., LLC v. United States,* 649 F.3d 1361, 1369 (Fed. Cir. 2011) (comparing the marketing of hydration packs to a standard backpack and remanding the case to perform a GRI 3(b) analysis); *Infantino, LLC v. United States*, Slip Op. 14-155, 2014 Ct. Intl. Trade LEXIS 164, at *14-15 (CIT December 24, 2014) (" ...though Infantino does not refer to its Shop & Play® line as "toys" like other items in the catalogue, the catalogue itself is called a "Toys and Activity Play" catalogue and does not feature Infantino's purely utilitarian travel products.")

close a door.  At the same time, Plaintiff also uses the term "keyed" in the title of the

subject merchandise, thereby making an important distinction between a keyed entry

device, on the one hand, and a privacy or passage device, on the other.  Accordingly,

the record demonstrates that Plaintiff uses terms such as "Knob" and "Knobset" that

would support a classification under Heading 8302, as well as the term "keyed" that

would support a classification under Heading 8301.  As a result, Plaintiff's titling of its

webpages does not weigh in favor of classifying the subject merchandise under one

tariff provision or the other.

### c.  Website Product Descriptions

The second marketing element that the court examines is terminology used in

website product *descriptions* of the subject merchandise.  In the "Product Overview"

section of the webpages, Plaintiff references the subject merchandise as "keyed locks".

*See Subject Articles Webpages, supra* ("Defiant *keyed locks* can be re-keyed to fit our

existing KW1 keyway") (emphasis supplied).  By contrast, in the "Details" section of the

webpages, Plaintiff lists the subject articles as "knobs" – not locks – in the "Door Locks

& Knobs Product Type" field.  *Id*.  These descriptions reference both the keyed lock

aspect and the knob aspect and, therefore, do not weigh in favor of classifying the

subject merchandise under one tariff provision or the other.

### d.  Physical Packaging of the Products

The third marketing element that the court examines is the *physical packaging* of

the products.  For this subfactor, the court examines: (1) the *labeling* of the product on

the packaging; and, (2) *phrases* found on the packaging.

Plaintiff *labels* the packaging of the subject merchandise as "Keyed Entry," thereby highlighting the keyed lock mechanism.  Def. Ex. 2, Physical samples of SKU 154644 (Ex. 2A), SKU 154709 (Ex. 2B), SKU 154733 (Ex. 2C), and SKU 881996 (Ex. 2D).  In comparison, Plaintiff labels the packaging of the privacy devices as "Bed & Bath Locking Interior," and the passage devices as "Hall & Closet Non-Locking Interior."  Pl. Ex. 16, Physical samples of SKU 883624 (Exhibit 16B), and SKU 883767 (Exhibit 16C).  In sum, the record indicates that Plaintiff labels the packaging of its passage, privacy and entry devices according to each one's respective locking capabilities.  In this respect, Plaintiff's labels highlight the keyed lock component of the subject merchandise, appropriately classified in Heading 8301, suggesting an essential character that falls under that heading.

The court next turns to *phrases on the physical packaging* of the subject merchandise.  The packaging of the subject merchandise contains three relevant phrases: (1) "5 pin cylinder"; (2) "Meets or exceeds ANSI Grade 3 standards";[17] and, (3) "round corner or drive-in latch options fits [sic] every door."  Def. Ex. 2, Physical samples of SKU 154644 (Ex. 2A), SKU 154709 (Ex. 2B), SKU 154733 (Ex. 2C), and SKU 881996 (Ex. 2D).

Defendant asserts that the phrases "5 pin cylinder" and "Meets or exceeds ANSI Grade 3 standards" support Defendant's argument that Plaintiff emphasizes the locking feature of the subject merchandise.  Defendant maintains that inclusion of the 5-pin cylinder and ANSI rating is intended to convey to a consumer that "the product has been tested for strength and security."  Def. Br. at 20-21.  *See also* ANSI/BHMA

---

[17] ANSI/BHMA test door hardware products to grade levels, Grades 1, 2 and 3. Grade 3 offers the lowest level of strength and security.  Def. Ex. 3, Colvin Dep. at 19-20.

A156.2-2011 Appendix B, Chart 1 (charting 25 tests, four of which relate to security, to which the devices are subject).  In fact, Plaintiff's website also states clearly that an ANSI "[l]ock grade … is a reflection of the durability of the lock, not the amount of security it provides."  The Home Depot, Buying Guide: Types of Door Locks available at https://www.homedepot.com/c/ab/types-of-door-locks/9ba683603be9fa5395fab90dfb1e7e6 (last visited March 23, 2020).  This information would signal to a consumer that "ANSI Grade 3" is a rating of the product by a national standards-setting institution based on a variety of criteria, including, but not limited to, factors related to security.

Therefore, the evidence does not support Defendant's argument that the "5 pin cylinder" and "ANSI Grade 3" phrases on the product packaging indicate that the lock components of the subject merchandise comprise the essential character of the product.

Notably, Defendant does not address the third phrase including on the product package, "round corner or drive-in latch options fits [sic] every door." This phrase relates to the product's latching feature.  The latching mechanism on a door allows it to remain in the "closed" position.  This phrase highlights an aspect of the latch mechanism that is identical in passage, privacy and keyed entry devices.  This phrase, therefore, highlights subcomponents of the subject merchandise appropriately classified in Heading 8302, suggesting an essential character that falls under that heading.

In sum, examining the labeling of the product packaging and phrases found on the packaging, the court concludes that these marketing elements do not weigh in favor of classifying the subject merchandise under one tariff provision or the other.

For comparison purposes, the court also examines phrases used in product packaging for privacy and passage devices.  The product packaging for privacy devices contains the phrase "privacy *lock*, no *key* needed."  *See* Physical Sample of SKU 883624 - Hartford Satin Nickel Privacy Knob (Ex.16B) (emphasis supplied).  The first part of the phrase is an example of the varied use of the term "lock," including with respect to privacy devices that fall outside of Heading 8301.  By contrast, the second part of the phrase highlights a fundamental distinction between a privacy device and an entry device: namely, the need for a key, and the fact that a key is not needed to operate a privacy device.[18]

The product packaging for passage devices contains the phrase "for use where *locked entry* is not necessary."  *See* Physical Sample of SKU 883767- Hartford Satin Nickel Passage Knob (Exhibit 16C) (emphasis supplied).  As with privacy and entry devices, this phrase addresses the locking capability of the product.[19]  Other phrases on the product packaging of passage devices emphasize only the knob aspect:  "Ideal for hall and closet doors" and "round corner or drive-in latch options fits [sic] every door."  *See* Physical Sample of SKU 883767- Hartford Satin Nickel Passage Knob (Exhibit 16C).

In comparing the product packages of passage, privacy and entry devices alongside each other, the court notes that the packaging is the same in shape and structure, and the phrases are similar to each other.  The packaging indicates that the

---

[18] Similarly, other phrases on the product packaging of privacy devices emphasize both aspects.  The phrase "Locks from inside only" emphasizes the locking capabilities, while the phrase "round corner or drive-in latch options fits every door" emphasizes the door knob aspect.  *See* Physical Sample of SKU 883767- Hartford Satin Nickel Passage Knob (Exhibit 16C).

[19] Other phrases on the product packaging of passage devices emphasize only the knob aspect:  "Ideal for hall and closet doors" and "round corner or drive-in latch options fits [sic] every door." *See* Physical Sample of SKU 883767- Hartford Satin Nickel Passage Knob (Exhibit 16C).

three devices share a large amount of commonality and demonstrates that Plaintiff

regards the three devices similarly, intentionally grouping them together.  The only

significant differences among the packages are in color and in the specific phrases that

identify the locking capabilities of each product.

These similarities in the physical packaging of this line of products (the subject

merchandise, privacy device and passage device) suggest that the knob mechanism is

the essential character of the subject merchandise.

### e.  Installation Instructions

The fourth marketing element that the court examines is the installation

instructions included in the product package.  Installation instructions for passage,

privacy and entry devices are identical.  *See* Physical samples of SKU 881996 (Ex.

16A), SKU 883624 (Ex.16B), and SKU 883767 (16C).  The instructions for all of the

devices are printed in brown ink and refer to the respective devices as "locks" and

"locksets."  The record evidence indicates that the installation instructions are written

broadly to apply to all of the various door hardware devices, regardless of whether

those devices contain a keyed lock (the subject merchandise), a non-keyed lock

(privacy devices) or no lock at all (passage devices).  Here, Plaintiff refers to a keyed

entry device as a "lock," but Plaintiff also refers to the privacy and passage devices as

"locks."

This commonality in the installation instructions indicates that Plaintiff treats all

three types of devices similarly in regard to this aspect of its marketing materials.  This

fact supports the view that the essential character is the knob feature, which is common

to all of the devices, rather than the lock feature, which two of the devices contain

(privacy and keyed entry), or the keyed lock feature, which is distinct to the keyed entry

device.

### f. Buying Guides

The fifth marketing element that the court examines is Plaintiff's Buying Guides.

Defendant asserts that Plaintiff's inclusion of the keyed entry device in the Buying Guide

titled "Types of Door Locks" is evidence that Plaintiff advertises the subject merchandise

according to its "lock" characteristic and, therefore, supports a finding that the lock is the

essential character.  Def. Br. 18-19.

The court does not find this argument persuasive for three reasons.  First, the

court notes that the subject merchandise is actually listed in *two* guides:  one titled

"Types of Door *Locks*," the other titled "Types of Door *Knobs*."  *See* The Home Depot,

Buying Guide: Types of Door Locks available at

https://www.homedepot.com/c/ab/types-of-door-

locks/9ba683603be9fa5395fab90dfb1e7e6 (last visited March 23, 2020) (emphasis

supplied); The Home Depot, Buying Guide: Types of Door Knobs available at

https://www.homedepot.com/c/ab/types-of-door-

knobs/9ba683603be9fa5395fab904c219eca (last visited March 23, 2020) (emphasis

supplied).  The "Types of Door Locks" Buying Guide includes lever handlesets, entry

devices, deadbolts, electronic door locks and sliding door locks.  The Home Depot,

Buying Guide: Types of Door Locks available at

https://www.homedepot.com/c/ab/types-of-door-

locks/9ba683603be9fa5395fab90dfb1e7e6 (last visited March 23, 2020).  Defendant

fails to mention or address the Buying Guide titled "Types of Door *Knobs*," which also

includes entry devices, along with dummy, passage and privacy devices.  *See* The

Home Depot, Buying Guide: Types of Door Knobs available at

https://www.homedepot.com/c/ab/types-of-door-

knobs/9ba683603be9fa5395fab904c219eca (last visited March 23, 2020) (emphasis

supplied).

Second, Plaintiff references the subject merchandise as "Entry Door Knobs" –

not "Keyed Entry Door Knobs" – on the webpage cited by Defendant, thus further

undermining the conclusion Defendant asks the court to draw.  The Home Depot,

Buying Guide: Types of Door Locks available at

https://www.homedepot.com/c/ab/types-of-door-

locks/9ba683603be9fa5395fab90dfb1e7e6 (last visited March 23, 2020).  *See also* Pl.

Resp. Br. at 7-8.

Third, the court notes that Plaintiff includes three informative sentences on its

webpage titled "Types of Door Knobs."  The first includes reference to "safety and

security," as noted by Defendant.  The Home Depot, Buying Guide: Types of Door

Knobs available at https://www.homedepot.com/c/ab/types-of-door-

knobs/9ba683603be9fa5395fab904c219eca (last visited March 23, 2020).  The second

adds that such devices "are frequently used for home entrances, including the front door

and patio door."  *Id*.  The third sentence states, interestingly: "[entry devices] can also

be used to secure other rooms in your home like your basement or an important storage

space."  *Id*.  The fact that Plaintiff markets the product for use on an *interior* door, as

well as on an *exterior* one, lends support to the view that the knob component of the

device, rather than the lock component and security feature, comprises the essential

character of the subject merchandise.  That is because using an entry knob on an interior door suggests that a lower level of security is needed.[20]

In sum, based on the foregoing, the court concludes that the Buying Guides do not weigh in favor of classifying the subject merchandise under one tariff provision or the other.

### g. Plaintiff's "Leader's Guide" for Customer Workshops

#### 1. Parties' Arguments — Hearsay Objection

The sixth and final marketing element that the court examines is comprised of a document entitled "[[                    ]]," which Plaintiff provides to [[

                                    ]].  *See* Defendant Confidential

Exhibit (Def. Conf. Ex.) 4, [[

               ]].  The document is a [[

                              ]].  *See* [[

  ]].  Defendant asserts that the [[      ]] reflects that Plaintiff "considers door looks [sic] to include entry locks containing keyed cylinders, much like the merchandise under consideration in this case."  Def. Br. at 18.

Plaintiff objects to Defendant's use of this document in Defendant's briefs as inadmissible hearsay.[21]  Pl. Resp. Br. at 3.  Defendant responds that the document is

---

[20] *See also* Colvin Exp. Rep. at 9 and discussion at section IV, *infra.*, suggesting that when security is the priority for an exterior door, an entry device should be accompanied by a lock, such as a deadbolt, offering greater security.

[21] Defendant relies (in its general statement of material facts and in its cross-motion brief in support of summary judgment) on an additional confidential document to which Plaintiff objects as well on the grounds of inadmissible hearsay: Def. Conf. Ex. 5, [[                    ]].  *See* Def. Br. at 6, 20; Def. Stmt. Facts, ¶¶ 26, 29-33.  However, because the court does not rely on or discuss information in that document in the court's analysis, the court does not review that document under Plaintiff's hearsay objection.

not hearsay and is instead an admission or adopted admission pursuant to the Federal Rules of Evidence ("Fed. R. Evid.") 801(d)(2).[22]  Def. Reply Mem. in Further Support of Cross-Mot. for Summ. J. ("Def. Reply Br.") at 12.

The court determines that the document is not hearsay and, therefore, may be considered by the court.  The court bases this determination on Plaintiff's admission or adopted admission under Federal Rules of Evidence 801(d)(2)(D) and Plaintiff's adoption of a statement under Federal Rules of Evidence 801(d)(2)(B).

Hearsay is a statement that "(1) the declarant does not make while testifying at the current trial or hearing, and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  A "statement" can include written assertions such as documents.  Fed. R. Evid. 801(a).

Hearsay generally cannot be considered in the context of a motion for summary judgment, unless a federal statute, the Federal Rules of Evidence, or other rule prescribed by the Supreme Court provides otherwise.  *See* Fed. R. Evid. 802.  "[If the [evidence] contains what would be hearsay testimony that would be inadmissible at trial, then it is not useable to support or defeat a motion for summary judgment."  Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 6334 (1st ed. 1980).

Plaintiff produced the [[          ]] document during discovery in response to one of Defendant's requests for production.  The request included a total of ten documents, the other nine of which are not in dispute and have also been relied on by both parties in

---

[22] Defendant also asserts that, if the court concludes that the documents are hearsay, they are admissible as a hearsay exception for business records pursuant to Fed. R. Evid. 803(6).  Def. Reply Br. at 13 n.11. Because the court concludes that the document is not hearsay under Fed. R. Evid. 801(d)(2)(D), the court does not proceed to consider whether the document is hearsay subject to the business records exception of Fed. R. Evid. 803(6).

their briefs.  *Compare* Pl. 1st Req. for Prod. Resp. ¶ 4 *to* Pl. Br.; Def. Br.  Defendant

requested that Plaintiff "produce all document(s) which were used in connection with the

sales, merchandising and/or marketing of each of the decorative variations of the

imported merchandise in the United States."  Pl. 1st Req. for Prod. Resp. ¶ 4.  Plaintiff's

response stated that "Plaintiff *identifies and produces*" the documents.  *Id.* (emphasis

supplied).  Plaintiff objected to the request as "ambiguous and overly broad," yet still

proceeded to supply Defendant with the document in question as well as other

documents in response to the request.  *Id.*

        The [[          ]] is one of many documents on which Plaintiff relied when it

responded to Defendant's interrogatories.  Pl. 1st Interrog. Resp. ¶ 1(c).  Further, the

document bears the Home Depot logo on every page of the document except for the

pages containing the table of contents.  Def. Conf. Ex. 4, [[

                ]].  Finally, Plaintiff marked this document as confidential during

discovery.  *Id.*

        The court determines that the [[          ]] is not hearsay for two reasons.  First,

where "the statement is offered against an opposing party, and... was made by the

party's agent or employee on a matter within the scope of that relationship and while it

existed," that statement is not hearsay and is to be understood as a party admission or

adopted admission.  Fed. R. Evid. 801(d)(2)(D).  It is well established that answers to

interrogatories may be admitted as admissions under this rule.  *See, e.g., Bell v. A-Leet

Leasing Corp.,* 863 F.2d 257, 259 (2d Cir. 1988) ("It is clear that answers to

interrogatories may be utilized as admissions"); *Tamez v. City of San Marcos,* 118 F.3d

1085, 1098 (5th Cir. 1997); *Walker v. Mulvihill*, No. 94-1508, 1996 U.S. App. LEXIS

14397, at *18 (6th Cir. April 24, 1996) (a party opponent's answers to interrogatories are admissible as admissions).  Plaintiff's actions in producing the Leader Guide and relying on the document when responding to interrogatories are sufficient evidence of a party admission.  Fed. R. Evid. 801(d)(2)(D).

In this case, there is additional evidence of admissibility under Fed. R. Evid. 801(d)(2)(D).  For example, the presence of Home Depot's logo on almost every page of the document is strong evidence of a statement adopted by Plaintiff.  Fed. R. Evid. 801(d)(2)(D).  *See United States v. Univar USA Inc.*, 42 CIT ___, ___, 355 F.Supp.3d 1225, 1236 (2018).  In addition, Plaintiff's decision to mark the document as confidential indicates that Plaintiff recognizes the document as one of proprietary importance.  Fed. R. Evid. 801(d)(2)(B).

In conclusion, the court determines that the [[          ]] is admissible under Federal Rules of Evidence 801(d)(2)(D) and 801(d)(2)(B).  Accordingly, Plaintiff's hearsay objection to this document is denied.

### 2.    Parties' Arguments — Essential Character

Turning, then, to a consideration of the [[          ]], Defendant asserts that the document includes entry devices in the [[                ]]  Defendant maintains that this fact is evidence that the Plaintiff markets the subject merchandise as locks rather than knobs.  Def. Br. at 18 (citing Def. Conf. Ex. 4, [[

          ]]).  However, it is notable that Plaintiff also refers to dummy, passage and privacy devices as [[                ]].  Def. Conf. Ex. 4, [[          ]].  Privacy devices, as discussed, have locks, but are classified in Heading 8302, while dummy and passage devices do not have locking mechanisms, and dummy devices do not even

have a latch mechanism.  Accordingly, the [[                          ]] is overinclusive

of devices that are classified in Heading 8302.  The manner in which Plaintiff references

the subject merchandise in this document, therefore, does not weigh in favor of

classifying the subject merchandise under one tariff provision or the other.

Defendant further asserts that Plaintiff highlights the keyed lock mechanism in

the [[          ]] with the phrases (1) "[[              ]]" and, (2) "[[

              ]]."  Def. Br. at 18 (citing Def. Conf. Ex. 4, [[              ]]).  Both

phrases highlight the keyed lock component of the subject merchandise:  the "[[

      ]]" phrase because it [[

        ]]; the second phrase because it [[

                              ]]."  Therefore, the court concludes that these two

phrases constitute evidence that Plaintiff's marketing materials highlight the keyed lock

feature of the subject merchandise.

### h.  Conclusion — Marketing Materials

In sum, Plaintiff's marketing materials refer to the subject merchandise by various

names, including "knob," "knobset," "door knob," "door knob with lock," "entry knob,"

"entry knobset," "entry lock," "keyed entry," "lock" and "lockset."  For reasons discussed

above at section II, the court does not find that the use of the term "lock," is probative of

whether the essential character of the subject merchandise is its keyed lock component

or its knob component.  A more limited number of materials refers to the "keyed lock"

component, and those materials suggest that the essential character is in fact a keyed

lock within the meaning of Heading 8301.  However, there are also many references to

the knob feature that would suggest that the essential character is a knob within the

meaning of Heading 8302.  The marketing materials, therefore, do not weigh in favor of classifying the subject merchandise either as a keyed lock mechanism or as a knob mechanism.

## III.  Quantitative Data

### a.   Subcomponents of the Subject Merchandise

The record before the court contains uncontested information concerning the weight, value and visible surface area of six subcomponents of the subject merchandise.  These quantitative factors are relevant considerations for an essential character analysis.  *See* HTSUS, GRI 3(b) EN Rule 3 at (VIII).  *See also Alcan Food Packaging (Shelbyville) v. United States*, 37 CIT ___, ___, 929 F.Supp.2d 1338, 1349 (2013)*, aff'd,* 771 F.3d 1364 (Fed. Cir. 2014) (reviewing the weight, thickness, and value of component materials to determine the essential character of imported packaging material).

The six subcomponents of the subject merchandise are: (1) exterior knob assembly (36 percent in weight, 35 percent in value, and 34 percent in surface area); (2) interior knob assembly (23 percent in weight, 26 percent in value, and 33 percent in surface area); (3) latch assembly (21 percent in weight, 15 percent in value, and 17 percent in surface area); (4) flanged strike plate (4 percent in weight, 2 percent in value, and 10 percent in surface area); (5) key cylinder (9 percent in weight, 12 percent in value, and 1 percent in surface area); and, (6) two keys (3 percent in weight, 9 percent in value, and 2 percent in surface area).[23]  Pl. Ex. 11, Product Breakdown Matrix

---

[23] The seventh subcomponent of the subject merchandise, mounting hardware, consists of screws.  Plaintiff considers that these items are classifiable in HTSUS Heading 7318.  Pl. Br. at 17 n.8.  Defendant did not object to this projected classification.  *See generally,* Def. Resp. Br.  Therefore,

Provided by Fu Hsing Industrial.  These figures are not contested by the parties.  Def. Br. at 27 ("We do not dispute the weights and costs of each subassembly set forth in Home Depot's brief.").

Plaintiff argues that the data for all subcomponents except for the key cylinder and keys – viz., the interior knob assembly, exterior knob assembly, latch assembly and strike plate – should be attributed solely to the knob mechanism.  *See* Pl. Br. at 25; *see also* Transcript of Oral Argument at 121-22.  Plaintiff further asserts that, under this approach, the subcomponents of the knob mechanism account for the majority of the weight, value and visible surface area of the subject merchandise.  Pl. Br. at 25-27.

During the course of the proceeding, Defendant took two different positions on this issue.  In its briefs, Defendant argued that every subcomponent, except for the key cylinder and keys, contributes to both the keyed lock mechanism and the knob mechanism and should, therefore, be attributed to both mechanisms:

> [B]ecause the interior knob assembly, exterior knob assembly, latch mechanism, and strike plate, contribute to both the knob function described by heading [sic] 8302 and the locking function described by heading [sic] 8301, the significance of the data involving the value, weight and visible surface area are equally relevant to both headings.

Def. Br. at 27-28.  Defendant added: "The key pin cylinder and the keys can only be attributable to heading 8301."  Def. Br. at 28.  By contrast, at oral argument, Defendant stated that the interior knob is not a subcomponent relevant to the keyed lock mechanism.  *See* Transcript of Oral Argument at 59-61.

---

the court does not consider mounting hardware in the comparison of Heading 8301 versus Heading 8302.  For that reason, the percentages reported in this opinion will amount to slightly less than 100 percent.

Defendant's initial argument was that all of the subcomponents of the subject merchandise, and, therefore, the entirety of the subject merchandise, is classifiable in Heading 8301.  Def. Br. at 27-28.[24]  This argument is no different from a GRI 1 analysis, which the CAFC expressly rejected.  *Home Depot,* 915 F.3d 1374.  In fact, the CAFC directed this court to conduct a GRI 3(b) analysis and, in so doing, determined that each heading covers only part of the subject merchandise:

> Even though the doorknob handle plays a role in the locking mechanism by serving as the lever that withdraws the bolt when the device is unlocked, the doorknob and lock components are nonetheless largely separate.  They consist of separate physical components and serve different purposes…. The doorknob of the subject articles is not simply an improved version of a lock.

*Home Depot*, 915 F.3d at 1380.

At oral argument, Defendant, when pressed, changed its position to state that the interior knob was attributable solely to the knob component, and, therefore, Heading 8302.  Taking Defendant's initial and revised positions together would lead to the conclusion that Defendant considers that there are three baskets of subcomponents: (1) those that are attributable only to the lock component (the cylinder and keys); (2) those attributable only to the knob component (the interior knob); and, (3) those attributable to both components (the exterior knob, latch, and strike plate).

Following the CAFC's remand instructions and based on the record, the court determines that three subcomponents – the exterior knob assembly, key cylinder and keys – contribute predominantly to the keyed lock mechanism.  The remaining three subcomponents – the interior knob assembly, latch assembly, and strike plate – contribute predominantly to the knob component.

---

[24] Defendant also allowed that some subcomponents were also classifiable in Heading 8302.

The exterior knob of a keyed entry device contains two substantial differences

from the exterior knob of a privacy or passage device.  First, the exterior knob of a

keyed entry device contains a "specially designed" indentation to hold the pins from the

key cylinder in place.  Def. Reply Br. at 18.  *See* Def. Ex. 2, Physical samples of SKU

154644, SKU 154709, SKU 154733, and SKU 881996.  Indeed, Defendant relies on

U.S. Patent No. 6,202,457 ("457 Patent") as support that the design of the exterior knob

of a keyed entry device is distinctive.  Def. Br. at 8, 23.  The objective of this patent is

"to provide a lock core assembly for a cylindrical lock."  U.S. Patent No. 6,202,457.  This

design also places a back plate on the internal side of the exterior knob to cover the

indentation created for the key cylinder and to prevent the exposure of the key cylinder's

pins.  Def. Reply Br. at 18.  Neither the passage nor the privacy device is covered by

the 457 Patent.  Accordingly, the privacy and passage devices do not contain back

plates or indentations in their respective exterior knobs since neither device contains a

key cylinder.  *See* Def. Reply. Br. at 21; Pl. Ex. 16, Physical samples of SKU 882996,

SKU 883624 and SKU 883767.

Similarly, because only keyed entry devices contain key cylinders and keys, the

court attributes these subcomponents as well to the keyed lock mechanism in assessing

the quantitative data.

The interior knob assembly does not provide any function specific to a keyed

entry device and is identical to the interior knob assembly found in a privacy device.  Pl.

Ex. 16, Physical samples of SKU 881996 (Ex. 16A), SKU 883624 (Exhibit 16B), and

SKU 883767 (Exhibit 16C).  Accordingly, the court attributes the interior knob for a

keyed entry device to the knob component for purposes of the court's quantitative

assessment.  Def. Br. at 31; Pl. Ex. 3, Barbara Kaiser Deposition, May 25, 2016, at 203.

The strike plate is also not unique to a keyed entry device and, therefore, contributes

predominantly to the knob mechanism for the same reason.  Defendant maintains that

the latch assembly contributes to the keyed lock mechanism because this component

contains a dead locking latch bolt.  Def. Br. at 24.  *See also* Transcript of Oral Argument

at 59.  The court disagrees with Defendant's legal conclusion — ANSI standards make

clear that dead locking latch bolts can be found on devices classifiable in Heading 8302

as well as Heading 8301.  Pl. Ex. 3, Barbara Kaiser Deposition, May 25, 2016 at 127-

128.  *See also* ANSI/BHMA A156.2-2011 at 9-12.  The record also demonstrates that a

dead locking latch bolt can be found on non-keyed devices.  *See* ANSI/BHMA A156.2-

2011 at 9-12 for Function Descriptions F77A, F77B, F89, and F111.

Accordingly, based on the record and the analysis above, the court attributes the

exterior knob assembly, key cylinder and keys to the keyed lock component of the

subject merchandise, properly classifiable under Heading 8301 in assessing the

quantitative data.  The court attributes the interior knob assembly, strike plate, and latch

bolt assembly to the knob component, properly classifiable in Heading 8302.

In section III.b, below, the court compares the weight, value and visible surface

area of the subcomponents that comprise keyed lock component with the weight, value

and visible surface area of the subcomponents that comprise the knob component.

In section III.c, below, the court also compares the weight and value of the

subject merchandise with its respective privacy and passage counterpart devices.

Privacy and passage devices are classified in Heading 8302 and will, therefore, provide useful comparisons to the subject merchandise.

### b.  Value, Weight and Visible Surface Area of Subcomponents

Based on the foregoing definitions, the subcomponents of the knob mechanism and the subcomponents of the keyed lock mechanism have approximately the same weights and values.  The subcomponents of the knob mechanism are greater than the subcomponents of the keyed lock mechanism in visible surface area, but not to a significant extent.

In particular, the subcomponents of the keyed lock mechanism – the exterior knob assembly, key cylinder and keys – comprise, on average, 48 percent of the weight, 55 percent of the value, and 37 percent of the visible surface area of the subject merchandise.[25]  The subcomponents of the knob mechanism – the interior knob assembly, latch assembly and strike plate – comprise, on average, 49 percent of the weight, 43 percent of the value, and 60 percent of the visible surface area.[26]

When one component or subcomponent material does not *clearly predominate* over another, quantitative differences alone may not form the basis for a determination of essential character.  *See, e.g.*, *Swimways Corp. v. United States*, 42 CIT ___, ___, 329 F. Supp. 3d 1313, 1322 (2018) (finding, in a quantitative comparison, that "both the textile materials and the plastic materials [were]

---

[25] These figures reflect an average for the four metal finishes discussed above of exterior knob, key cylinder and keys.  *See* Pl.'s First Response to Def.'s Request for Prod. ¶ 9(a).  The precise weight, value, and surface area of the subject articles' subcomponents vary slightly among the four finishes at issue.  All percentages have been rounded to the nearest percentage point.

[26] These figures reflect an average of the four models' interior knob assembly, latch assembly and strike plate.  *See* Pl.'s First Response to Def.'s Request for Prod. ¶ 9(a).  The precise weight, value, and surface area of the subject articles' subcomponents vary slightly among the four models at issue.  All percentages have been rounded to the nearest percentage point.

present in significant, but not clearly predominant, proportions" so that a quantitative comparison was not persuasive).

The subcomponents of the keyed lock mechanism are greater than the subcomponents of the knob mechanism in value, but not by a significant proportion. The subcomponents of the knob mechanism prevail with respect to weight and visible surface area, but, again, not by a significant proportion.  Accordingly, the court concludes that the quantitative data related to the components of the subject merchandise do not weigh in favor of classifying the subject merchandise under one tariff provision or the other

Further, the facts in the record do not support Defendant's contention that a consumer's choice to purchase an entry device over a privacy or passage device is evidence of a "price premium" reflecting the "additional security" of an entry device as Defendant contends.  Def. Reply Br. at 15.  In fact, the record demonstrates that the price of a keyed entry device with the most expensive finish (a satin-nickel finish), as sold by Plaintiff, actually costs *more* than the price of a basic deadbolt lock, also as sold by Plaintiff.  Pl. Ex. 10, Sitkowski Affidavit, Ex. B.  Yet, it is uncontested that a deadbolt provides a higher level of security than a keyed entry device.  Pl. Ex. 5, Colvin Exp. Rep. at 18-19.  This fact illustrates that a consumer's preference for the *appearance* of the doorknob can command a greater price premium than the level of security provided by a given device.[27]

---

[27] This conclusion is bolstered by price data.  A keyed entry device with a Satin Nickel finish costs three dollars more than an entry device with any of the other three types of finishes.  Transcript of Oral Argument at 126.  *See also Subject Articles Webpages; Privacy Devices Webpages; Passage Devices Webpages, supra.*  By contrast, an entry device with any of the other finishes – "Polished Brass," "Antique Brass" or "Stainless Steel" costs just fifty cents more than the respective privacy device in each of those finishes.  Clearly, the price premium for this line of devices reflects the value of the material and appearance more than the level of security.

In sum, the quantitative data relating, respectively, to the lock component and knob component of the subject merchandise do not weigh in favor of classifying the subject merchandise under one tariff provision or the other.

### c.  Weight and Value in relation to Other Door Devices

The court also compares the weight and value of each of the four metal finishes of the subject articles to the weight and value of each one's related privacy and passage devices.  None of the decorative variations of the subject merchandise differs significantly from its respective privacy or passage device in weight and value.

The "Product Overview" sections of the product webpages provide the weight and value data of all three devices.  *Subject Articles Webpages, Privacy Devices Webpages, Passage Devices Webpages.*[28]  The contents of Home Depot's website have been admitted into evidence and are undisputed by the parties.  Pl. Stmt. Facts ¶ 9 (citing to http://www.homedepot.com as a general domain); Def.'s Resp. to Pl. Stmt. Facts ¶ 9.  The record demonstrates that the subject merchandise does not differ significantly in value and weight from its respective privacy and passage versions.  On average, the value of the subject merchandise ($9.72) is $0.62 more than the privacy device (less than seven percent of an average retail price of $9.10) and $1.25 more than the passage device (less than 15 percent of an average retail price of $8.47).[29]

---

[28] The webpages do not provide visible surface area data for passage, privacy or entry devices, and there is no information in the record providing visible surface area data for those devices.  The surface area of a solid object is a measure of the total area that the surface of the object occupies.  Weisstein, Eric W, *Surface Area*, MATHWORLD.  Passage, privacy and entry devices are largely similar in shape, size and structure.  Pl. Ex. 16, Physical samples of SKU 881996 (Ex. 16A), SKU 883624 (Exhibit 16B), and SKU 883767 (Exhibit 16C).  Based on their similarities in appearance, the court determines that the visible surface area of the subject merchandise does not differ significantly from its respective privacy and passage versions.

[29] These figures reflect the average difference in value of each model's entry device and their respective privacy and passage devices in 2015.  For entry devices, *see Subject Articles Webpages, supra.*  For

The average weight of the subject merchandise (0.98 pounds) is 0.15 pounds heavier than the privacy device (approximately 18 percent) and 0.22 pounds heavier than the passage device (approximately 29 percent).[30]

The minimal difference in weight and value between the keyed entry devices and their respective privacy and passage versions indicates that the specially designed exterior knob and key cylinder do not change significantly the product's weight or value. The exterior knob and the key cylinder are the primary design differences of the subject merchandise compared to the design of the privacy device.  The data indicate only small increases in weight and value and, therefore, show the high degree of commonality among the door devices.  The court has not identified other cases in which quantitative data have been evaluated in this way, but here the court finds merit in such comparison.  Accordingly, the court determines that the similar weights and values of the various door devices provide some, albeit limited, support for the conclusion that the knob components comprise the product's "essential character".

## IV.  Primary Function

The primary function of an article can be an important element of an essential character analysis and can help to inform the court's identification of the essential character of the merchandise.  For example, in *La Crosse Tech., Ltd. v. United States*, 723 F.3d 1353 (Fed. Cir. 2013), the CAFC applied a GRI 3(b) analysis to the classification of electronic devices that measured and displayed atmospheric and

---

privacy devices, *see Privacy Devices Webpages*, *supra*.  For passage devices, s*ee Passage Devices Webpages, supra*.

[30] These figures reflect the average difference in weight of the entry device for each of the four finishes along with their respective privacy and passage devices found under the "Specifications" subheading of each products webpage on Plaintiff's website.  For entry devices, *see Subject Articles Webpages, supra*. For privacy devices, *see Privacy Devices Webpages*, *supra*.  For passage devices, s*ee Passage Devices Webpages, supra*.

weather conditions alongside temporal information typical of clocks.  The CAFC

concluded that the weather-related, meteorological capabilities of the devices were the

predominant features because they were far greater in number than those related to

temporal information.[31]  *LaCrosse*, 723 F.3d 1353, 1360.  The CAFC found, therefore,

that the weather-related functions provided the essential character of the devices.  *Id.*

Plaintiff argues that the primary functions of a keyed entry device – similar to a

privacy or passage device – are to latch and fasten a door, provide an object to grasp

and turn to open a door, close a door, and allow people to pass through a door opening.

Pl. Br. at 7.  Plaintiff further argues that the keyed lock mechanism of a keyed entry

device is "incidental" and "optional" because the knob component can function without

the lock component, but the lock component cannot perform its function without the

knob component.  *See* Transcript of Oral Argument at 29-32.  *See* also Pl. Br. at 8.

Defendant argues that the role of the key cylinder in relation to the use of the

subject merchandise demonstrates that its essential character is the product's keyed

lock mechanism.  Def. Br. at 16.  Defendant maintains that the primary function of an

entry device is to secure and lock a door, Def. Br. at 17, specifically to exclude those

who do not have a key.  Transcript of Oral Argument at 47.

Defendant relies on *Conair Corp. v. United States*, 29 CIT 888 (2005), to support

its position.  Def. Br. at 16.  In *Conair*, this court held that tabletop fountains known as

"Serenity Ponds" were properly classified as "pumps for liquids" because the pumps

imparted the fountains with their essential character, notwithstanding that the fountains

---

[31] The CAFC uses the terms "weather related capabilities," "weather-related functions," and "weather-related features" interchangeably in the *LaCrosse* decision.  *LaCrosse*, 723 F.3d 1353, 1360.

contained several components.  *Conair Corp. v. United States,* 29 CIT 888 (2005).  The

Government argued that the plastic decorative sculptures, *i.e.*, the simulated rocks or

plastic bamboo, imparted the essential character of the product.  *Id.* at 895.  However,

the court found that it was the sound of the water flowing over the simulated landscape

that created the "tranquil atmosphere," the "serenity," of the device.  The pump, in turn,

enabled the water to flow.  *Id.* at 896.

Defendant further argues that because an entry device costs about a dollar more

than a passage or privacy device, *see* section III.c., *supra,* consumers who purchase an

entry device are paying a "price premium" for the additional security function of the key

cylinder and keys.  Def. Reply Br. at 15.  Defendant maintains that consumers'

willingness to pay this "price premium" is evidence that the keyed lock mechanism is the

primary function of the subject merchandise.  *Id.*

The court concludes for the following reasons that the function of the knob

component of the subject merchandise provides its essential character.

First, both Parties agree that the knob component can function without the lock

component, but the lock component cannot function without the knob component.  *See*

Transcript of Oral Argument at 29-32.[32]  For example, the knob mechanism of the

subject merchandise is still operational if an individual manually removes the key

cylinder.  Transcript of Oral Argument at 62-63.  *See also* Pl. Br. at 22.

---

[32] This uncontested fact contradicts the testimony of Defendant's expert, who stated that the subject merchandise "is your basic security lock *with doorknobs attached*."  Pl. Ex. 3, Kaiser Dep. at 181 (emphasis supplied).  In fact, the record demonstrates that the key cylinder and other lock-related subcomponents could not function without the doorknob component.  Transcript of Oral Argument at 62-63.  *See also* Pl. Br. at 22.

Second, the subject merchandise provides *some* security, but its more significant

function is to provide a means to grasp, open and close a door.  Pl. Ex. 5, Colvin Exp.

Rep. at 20.  As further evidence of this fact, Plaintiff's webpage for the product notes

that the subject merchandise is recommended also for use on interior doors in a home,

which clearly merit a lower level of security than doors to the outside.  The Home Depot,

Buying Guide: Types of Door Knobs available at

https://www.homedepot.com/c/ab/types-of-door-

knobs/9ba683603be9fa5395fab904c219eca (last visited March 23, 2020).  Indeed,

Defendant acknowledges that the keyed entry device is on "the lower end of security."

Transcript of Oral Argument at 101.  Plaintiff does not recommend an entry device for

use by itself on an entry doorway.  *Id.* at 17-20.  In fact, Plaintiff always recommends

that a consumer purchase a deadbolt, which is built for security, for use on a residential

entrance in addition to purchasing a product, such as an entry device, that provides the

ability "to grasp hold of and use to open and close the door."  *Id*. at 9, 19.

This recommendation by Plaintiff suggests that the manufacturer designs the

subject merchandise around the knob assemblies, and the key cylinder is an additional

feature designed to fit into the knob assemblies.  Pl. Ex. 5, Colvin Exp. Rep. at 23.  The

knob assemblies define the fundamental nature of the subject merchandise and show

that there is more continuity among passage, privacy and entry devices than there are

differences among those devices.

These considerations distinguish the present case from the analysis conducted in

*Conair*, as relied on by Defendant.  In *Conair*, the court concluded that the tabletop

fountain would have no use without the pump that made the water flow, because the

product is "intended to appeal to the consumer's visual and auditory senses."  *Conair*, 29 C.I.T. at 896.

In this case, the knobset would in fact have utility without the key cylinder; it is the key cylinder that would have no utility without the knobset.  *See* Transcript of Oral Argument at 29-32.  Therefore, to the extent that *Conair* is pertinent to this case, it supports the conclusion that the function of the knob component, rather than that of the lock component, is primary and, as a consequence, imparts the product with its essential character.

A consumer does not purchase an entry device primarily, let alone predominantly, for its keyed lock component, but rather for its knob component that allows an individual to grasp, open and close a door.  *See* Pl. Ex. 5, Colvin Exp. Rep. at 15, 20.  *See also* Pl. Ex. 3, Kaiser Dep. at 181-82.  A consumer whose predominant priority is security would purchase a different product such as a deadbolt.  Pl. Ex. 5, Colvin Exp. Rep. at 17.  However, a deadbolt does not provide a means for a person to grasp the door from the outside to pull it open or closed.  Pl. Ex. 5, Colvin Exp. Rep. at 9; Pl. Ex. 3, Kaiser Dep. at 183.  Further, without a key or key cylinder, an entry device still maintains a locking ability through the internal locking mechanism of the interior knob that is identical to the interior knob of a privacy device.

In sum, based on the record, the primary function of a keyed entry device is to grasp, open and close a door.  This function is provided by the knob component.  The subject merchandise also functions to provide some security through the lock component; however, the record demonstrates that this function is secondary.

## CONCLUSION

Considering all of the factors discussed above and based on the totality of the evidence in the record, the court concludes that the essential character of the subject merchandise is its knob component, rather than its lock component.  See *Structural Indus.,* 29 C.I.T. at 185.

Doorknob: "Oh, no use!  I forgot to tell you!  I'm locked!"

Alice: "Oh no!"

Doorknob: "But of course, uh, you've got the key, so…"

Alice: "What key?"

Doorknob: "Now, don't tell me you've left it up there!"

Alice: "Oh, dear!  What ever will I do?"[33]

For the foregoing reasons, the court will and does grant summary judgment in favor of Plaintiff and denies Defendant's cross-motion.  Customs' classification is reversed and judgment will be entered accordingly.


                                                    /s/ Timothy M. Reif
                                                    Timothy M. Reif, Judge


Dated:          March 26, 2020
                New York, New York

---

[33] *Walt Disney's Alice In Wonderland, The All-Cartoon Wonderfilm* (1951), based on *Alice's Adventures in Wonderland and Through the Looking Glass*, by Lewis Carroll (1865, 1871).